UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| KIRSTEN HUNTER, AS GUARDIAN AD LITEM OF HER MINOR CHILD, A.Q., AND ON HER OWN BEHALF, | 3:17-CV-03016-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER GRANTING DSS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AVERA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| SOUTH DAKOTA DEPT. OF SOCIAL SERVICES, LYNN VALENTI, IN HER PERSONAL AND OFFICIAL CAPACITY; VIRGENA WEISELER, IN HER PERSONAL AND OFFICIAL CAPACITY; MATT OPBROECK, IN HIS PERSONAL AND OFFICIAL CAPACITY; KATIE ROCHELLE, IN HER PERSONAL AND OFFICIAL CAPACITY; TERESA CASS, IN HER PERSONAL AND OFFICIAL CAPACITY; DOE DEFENDANTS 1–4, AVERA ST. MARY'S HOSPITAL, | |
| Defendants. | |

Plaintiff Kristen Hunter,[1] individually and as guardian ad litem for her minor son A.Q., filed this action under 42 U.S.C. §§ 1983 and 1985 alleging that the Defendants—the South Dakota Department of Social Services, Lynne Valenti, Virgena Wieseler, and Matt Opbroek (collectively DSS Defendants) and Avera St. Mary's Hospital, Teresa Cass, Katie Rochelle, and Doe Defendants 1–4 (collectively Avera Defendants)—violated her and her son's rights under the Fourth Amendment, Fifth Amendment, and Due Process Clause of the Fourteenth Amendment.

---

[1] This Court refers to Plaintiff Kristen Hunter as "Hunter" when referencing her actions and statements, but as "Plaintiff" when referencing her claims on behalf of her minor son and herself.

Doc. 12 at ¶ 1. The DSS Defendants have filed a motion for summary judgment based upon the merits and on qualified immunity. Doc. 25. The Avera Defendants have filed a motion for summary judgment based upon the claim that they are not state actors. Doc. 29. This Court held oral argument on the motions on February 20, 2019. Doc. 66. For the reasons explained below, this Court grants DSS Defendants' motion for summary judgment and grants in part and denies in part Avera Defendants' motion for summary judgment.

## I. Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Com. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(l)(A), (B); Gacek v. Owens & Minor Distribution, Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that nonmovant may not merely rely on allegations or denials). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Gacek, 666 F.3d at 1145. In ruling on a motion for summary judgment, the facts and inferences fairly drawn from those facts are "viewed in the light most favorable to the party

opposing the motion." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587–88 (1986) (quoting <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962)).

## II. Fact Not Subject to Genuine Dispute[2]

During February 2017, Hunter, her three-year-old son, A.Q., her five-year-old daughter, and her boyfriend, Jeffry Stanley (Stanley), lived together in Pierre, South Dakota. Doc. 27 at ¶ 11; Doc. 42 at ¶ 11, Doc. 31 at ¶¶ 1–2; Doc. 39 at ¶¶ 1–2. Stanley was on state probation and, as part of conditions of probation, he was required to submit to urinalysis tests. Doc. 27 at ¶ 11; Doc. 42 at ¶ 11; Doc. 31 at ¶ 4; Doc. 39 at ¶ 4. Stanley failed to show up to a meeting with his probation officer Mina Bonhorst (Bonhorst) to provide a urine sample, so on February 22, 2017, Bonhorst went to Stanley's home. Doc. 31 at ¶ 4; Doc. 39 at ¶ 4. Stanley answered the door and admitted to having smoked methamphetamine and marijuana with Hunter the prior morning. Doc. 31 at ¶ 5; Doc. 39 at ¶ 5. Stanley stated that Hunter was not feeling well after using. Doc. 31 at ¶ 6; Doc. 39 at ¶ 6. When law enforcement arrived at Stanley's home, Hunter appeared disheveled and would not make eye contact. Doc. 31 at ¶ 7; Doc. 39 at ¶ 7. As a result of law enforcement's observations and Stanley's admissions, law enforcement suspected Hunter of being under the influence of methamphetamine "or something else during that time." Doc. 31 at ¶ 8; Doc. 39 at ¶ 8. Later that day, Stanley provided a urinalysis that tested positive for marijuana and was arrested.

---

[2] This Court takes the facts in the light most favorable to Plaintiff as the nonmoving party and draws the facts primarily from the portions of Defendants' the South Dakota Department of Social Services, Lynne Valenti, Virgena Wieseler, and Mat Opbroek's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment, Doc. 27, and the Avera Defendants' Statement of Undisputed Material Facts, Doc. 31, that were not genuinely disputed in Plaintiffs' Response to DSS Defendants' Statement of Undisputed Facts and Statement of Genuinely Disputed Issues of Material Facts that Preclude Summary Judgment, Doc. 42, and Plaintiffs' Response to Avera Defendants' Statement of Undisputed Material Facts and Statement of Genuinely Disputed Issues of Material Facts that Preclude Summary Judgment, Doc. 39.

Doc. 27 at ¶ 11; Doc. 42 at ¶ 11. Hunter learned that Stanley was going to be placed in jail for a probation violation. Doc. 31 at ¶ 9; Doc. 39 at ¶ 9; Doc. 28-2 at 3.

That same day, based on comments by Stanley, Bonhorst made a report to Child Protective Services (CPS), a division of the South Dakota Department of Social Services (DSS), of possible neglect concerning Hunter's two children. Doc. 27 at ¶ 12; Doc. 42 at ¶ 12; Doc. 28-1 at 1. Family service specialist Mat Opbroek (Opbroek) was assigned to investigate Bonhorst's report. Doc. 27 at ¶ 13; Doc. 42 at ¶ 13; Doc. 31 at ¶ 3; Doc. 39 at ¶ 3. At approximately 4:30 p.m., Opbroek and a CPS supervisor Iyvonne Jewett met with Pierre police officers to perform a welfare check at Hunter's residence. Doc. 27 at ¶ 14; Doc. 42 at ¶ 14; Doc. 31 at ¶ 10; Doc. 39 at ¶ 10. During the welfare check, Hunter admitted that she had used drugs while her children were present in the home but said she did not use drugs while in the same room as the children.[3] Doc. 27 at ¶ 15; Doc. 42 at ¶ 15. Hunter admitted to using methamphetamine four days before the welfare check and showed law enforcement where she injected methamphetamine into her arm. Doc. 27 at ¶ 16; Doc. 42 at ¶ 16. Hunter voluntarily provided a urine sample which field tested positive for methamphetamine and marijuana.[4] Doc. 27 at ¶ 17; Doc. 42 at ¶ 17; Doc. 31 at ¶ 11; Doc. 39 at ¶ 11.

---

[3] This Court is taking Hunter's account of what she said as true here. Doc. 39 at ¶ 12; Doc. 28-2 at 3. Avera Defendants dispute that Hunter did not use drugs in the same room as her children, Doc. 31 at ¶ 12; Doc. 28-2 at 27, but this fact is not material to whether summary judgment should enter.

[4] Based on law enforcement's investigation on February 22, 2017, Hunter was indicted and charged with possession of a controlled substance, a class 5 felony, and contributing to the abuse, neglect, and delinquency of a child under SDCL § 26-9-1, which is a class 1 misdemeanor. Doc. 27 at ¶ 53; Doc. 42 at ¶ 53. Hunter pleaded guilty to both charges and received a suspended sentence conditioned on her completion of the drug court program. Doc. 27 at ¶ 54; Doc. 42 at ¶ 54.

While at Hunter's residence, Opbroek observed drug paraphernalia where the children could get to it, and law enforcement informed Opbroek that there were drugs in the house. Doc. 27 at ¶ 18; Doc. 42 at ¶ 18; Doc. 31 at ¶ 19; Doc. 39 at ¶ 19. Opbroek determined that Hunter was still under the influence of drugs and thus unable to care for her children by herself, which constituted a present danger to the children. Doc. 27 at ¶ 19; Doc. 42 at ¶ 19; Doc. 31 at ¶ 13; Doc. 39 at ¶ 13. Opbroek also noted the presence of a knife impaled in the door frame when he first walked into Hunter's residence, which gave him further concerns for the children's safety. Doc. 31 at ¶ 20; Doc. 39 at ¶ 20. Opbroek did not believe that the potential danger from exposure to methamphetamine was sufficient to have the children screened the night of February 22, 2017. Doc. 27 at ¶ 21; Doc. 42 at ¶ 21. Hunter and Opbroek agreed to a present danger plan involving a neighbor named Margaret Rogers (Rogers). Doc. 27 at ¶ 20; Doc. 42 at ¶ 20. Rogers agreed to help monitor Hunter thereafter.[5] Doc. 27 at ¶ 20; Doc. 42 at ¶ 20.

On February 23, 2017, Opbroek ordered Hunter to get her children drug tested, and if she refused, Hunter "couldn't keep them." Doc. 39 at ¶ 15.[6] Opbroek's expressed rationale for the drug screen was his concern that Hunter's children might have been exposed to drugs at some level, including possible ingestion. Doc. 27 at ¶ 23; Doc. 42 at ¶ 23. Opbroek believed that the

---

[5] Because Hunter is the party opposing summary judgment, this Court is taking as true Hunter's account that the children were never removed from her custody, citing to Opbroek's deposition where he states the children "were always in [Hunter]'s custody." Doc. 39 at ¶ 14; Doc. 28-3 at 22. Avera Defendants contend that the "children were removed from [Hunter]'s care and put into the temporary care of Margaret Rogers." Doc. 31 at ¶ 14 (citing Doc. 28-3 at 7 where Opbroek states "[w]e were not able to find an individual that would be able to stay in the home to provide care for the children; so we did put the children with an individual that [Hunter] identified to care for the children.").

[6] Opbroek testified on February 23, 2017, that he requested Hunter to have a drug screen performed on her children and she agreed. Doc. 27 at ¶ 22; Doc. 42 at ¶ 22; Doc. 31 at ¶ 15. In contrast, Hunter testified that Opbroek told her that she had to have her children drug tested or she would not be able to keep her children, and that is why she agreed. Doc. 27 at ¶ 22; Doc. 42 at ¶ 22.

children could have been exposed to the drugs due to their ability to access to areas where drugs were kept. Doc. 31 at ¶ 17; Doc. 39 at ¶ 17. Depending on the situation, DSS wants to know if children are in danger of actual exposure to drugs and whether their parents' drug use is directly affecting the children. Doc. 31 at ¶ 16; Doc. 39 at ¶ 16.

Hunter and Opbroek discussed having the drug screening performed at the Avera Clinic where Hunter had previously obtained healthcare. Doc. 27 at ¶ 26; Doc. 42 at ¶ 26. Hunter testified that she did not know of any other option besides having the children drug tested at the Avera Clinic.[7] Doc. 42 at ¶ 25; Doc. 43-3 at 2; Doc. 31 at ¶ 24; Doc. 39 at ¶ 24. Opbroek told Hunter that he assumed the drug screens would involve urinalysis, but Opbroek did not discuss with Hunter how the medical provider would collect the samples used for the drug screens. Doc. 27 at ¶¶ 24, 32; Doc. 42 at ¶¶ 24, 32.

On February 24, 2017, Hunter contacted Opbroek to inform him that she wanted to go to Huron for Stanley's court hearing. Doc. 27 at ¶ 28; Doc. 42 at ¶ 28; Doc. 31 at ¶ 30; Doc. 39 at ¶ 30. Opbroek told Hunter to have the drug screens for the children completed before she left Pierre. Doc. 27 at ¶ 28; Doc. 42 at ¶ 28. Opbroek wanted the drug screening completed before Hunter traveled to Huron to help him determine if there were any medical or health threats to Hunter's children, including exposure to drugs. Doc. 27 at ¶ 29; Doc. 42 at ¶ 29; Doc. 31 at ¶ 31; Doc. 39 at ¶ 31. Hunter only agreed to have the drug screenings done because Opbroek said she would not be able to keep her children unless she had her children submit to urinalysis.[8] Doc. 42 at ¶ 28; Doc. 32-1 at 2.

---

[7] DSS Defendants contend that Opbroek told Hunter that the drug screens could be performed by her healthcare provider or by the South Dakota Child Assessment Center (CAC). Doc. 27 at ¶ 25; Doc. 28-3 at 11; Doc. 31 at ¶ 24; Doc. 39 at ¶ 24. Avera Defendants contend that Hunter chose to go to the Avera Clinic over the CAC. Doc. 31 at ¶ 26.
[8] As previously noted, this fact is disputed.

Hunter called the Avera Clinic and tried to make the appointments for urinalysis for her two children.[9] Doc. 33-1 at 6. Hunter told the lady who answered the phone at the clinic that she was requesting a urinalysis because CPS wanted one done. Doc. 33-1 at 6. The lady at the Avera Clinic "didn't have any knowledge of it." Doc. 33-1 at 6. Hunter called Opbroek and recounted her call to the Avera Clinic. Doc. 33-1 at 6. Opbroek called the Avera Clinic,[10] and then called Hunter back and told her that he made the appointment and dropped off some papers at the clinic. Doc. 33-1 at 6. The papers Opbroek dropped off were some blank versions of DSS's methamphetamine medical charting form. Doc. 27 at ¶ 31; Doc. 42 at ¶ 31; Doc. 31 at ¶ 32; Doc. 39 at ¶ 32. Opbroek did not give any other documents to Avera and did not fill out any part of the form. Doc. 27 at ¶ 31; Doc. 42 at ¶ 31. Opbroek verbally told someone[11] at the Avera Clinic that CPS was requesting "a toxicology or a drug screening" of Hunter's children because they might have been exposed to drugs. Doc. 27 at ¶ 32; Doc. 42 at ¶ 32. Opbroek requested that the results

---

[9] How the appointment with Avera Clinic was made is less than clear. Avera Defendants contend that Opbroek was not involved in scheduling the drug screening with Avera, which was done entirely by Hunter. Doc. 31 at ¶ 28. However, Avera nurse Katie Rochelle's (Rochelle) own deposition and Avera Defendants' statements of undisputed facts show that Opbroek was involved, to some degree, in making the appointment. Rochelle testified that she called Hunter after she received a note from an internal Avera system to call Hunter to gather more information about what was being requested. Doc. 31 at ¶ 40; Doc. 39 at ¶ 40; Doc. 33-5 at 2. Rochelle then spoke with Hunter and Hunter requested a urinalysis. Doc. 31 at ¶¶ 40–41; Doc. 39 at ¶¶ 40–41. Rochelle testified that she subsequently called Opbroek who confirmed that Hunter was going to have a drug screening completed at Avera Clinic. Doc. 31 at ¶ 42; Doc. 39 at ¶ 42. DSS Defendants also contend that "Opbroek did not schedule the appointment for [Hunter]." Doc. 27 at ¶ 30; see Doc. 28-3 at 28.

[10] Opbroek testified about this during the deposition as follows:
> Q. All right. So then after you have this phone call with Ms. Hunter, do you remember with any clarity, did you call the clinic or did the clinic call you about the drug screen?
> A. I don't recall, but in my notes it says that I contacted them.

Doc. 43-5 at 8.

[11] Rochelle testified in her deposition that she was the person Opbroek spoke to at the Clinic. Doc. 32-5 at 3.

be sent to DSS via fax. Doc. 39 at ¶ 75; Doc. 33-5 at 3. Opbroek had no further contact with anyone from Avera Clinic or with Hunter before the drug screening was performed. Doc. 27 at ¶ 33; Doc. 42 at ¶ 33.

Around 11:00 a.m. on February 24, Katie Rochelle (Rochelle), a registered nurse in Avera Clinic's pediatric department, called Teresa Cass (Cass), a pediatric nurse practitioner, about drug screening Hunter's children. Doc. 31 at ¶ 36; Doc. 39 at ¶ 36; Doc. 32-5 at 5, 8. Rochelle informed Cass that Opbroek had told Hunter to get her children drug screened. Doc. 39 at ¶ 37; Doc. 33-6 at 2. Cass then ordered the drug screen of Hunter's children. Doc. 31 at ¶ 36; Doc. 39 at ¶ 36. Cass did not speak to Opbroek or anyone at DSS about Hunter's situation. Doc. 31 at ¶ 37; Doc. 39 at ¶ 37. Cass was not present at the clinic at the time, Doc. 39 at ¶ 36; Doc. 33-6 at 2, 6, and indeed was not scheduled to work that day and was out of town. Doc. 32-6 at 2. There were two other pediatricians working that day, but they did not order the tests. Doc. 40-5 at 7.

On the Avera St. Mary's campus in Pierre, South Dakota, there are different departments with different buildings. Doc. 40-5 at 3. The Child Assessment Center (CAC) is one department located in a south building on the campus. Doc. 40-5 at 3. The CAC is a private agency funded through grants, the National Children's Alliance, and other organizations. Doc. 40-5 at 5. The CAC has an interagency agreement with DSS. Doc. 40-5 at 6. Every month, the CAC has a multi-disciplinary meeting involving the Department of Criminal Investigation, the Federal Bureau of Investigation, the state's attorney's office, and a patient advocate. Doc. 40-5 at 6. Cass works both for the CAC where she provides medical screening of children about 50 to 100 hours per year and for Avera Clinic where she is a full time pediatric nurse practitioner. Doc. 32-6 at 3; Doc. 40-5 at 6. Doc. 40-4 at 2.

On the afternoon of February 24, 2017, Hunter went to Avera Clinic with her children in order to have both of them drug screened. Doc. 31 at ¶ 35; Doc. 39 at ¶ 35; Doc. 31 at ¶ 38; Doc. 39 at ¶ 38. According to Avera's Informed Consent Policy, "[a] written informed consent must be obtained prior to any medical treatment being performed." Doc. 40-7 at 2. There is no evidence that Hunter signed an informed consent document that day. Doc. 42 at ¶ T. Hunter took her children to the lab area of Avera Clinic. Doc. 27 at ¶ 34; Doc. 42 at ¶ 34; Doc. 31 at ¶ 38; Doc. 39 at ¶ 38. Hunter, her children, and a lab tech went into a private bathroom. Doc. 27 at ¶ 35; Doc. 42 at ¶ 35. Hunter's daughter provided a urine sample by urinating into a specimen container shaped like a hat.[12] Doc. 27 at ¶ 35; Doc. 42 at ¶ 35; Doc. 31 at ¶ 38; Doc. 39 at ¶ 38. Hunter's son, A.Q., was not potty-trained. Doc. 27 at ¶ 36; Doc. 42 at ¶ 36. A laboratory technician tried to have A.Q. urinate into a specimen container shaped like a hat, but A.Q. would not urinate. Doc. 27 at ¶ 36; Doc. 42 at ¶ 36; Doc. 31 at ¶ 38; Doc. 39 at ¶ 38.

After A.Q. could not voluntarily produce a urine sample, the laboratory technician called Rochelle, and Rochelle took Hunter and her children to the pediatrics department to perform a catheterization on A.Q.[13] Doc. 27 at ¶ 38; Doc. 42 at ¶ 38; Doc. 31 at ¶ 53; Doc. 39 at ¶ 53; Doc. 28-4 at 3–4. Hunter felt like they were "rushed over across the room to the other." Doc. 29 at ¶ 46; Doc. 40-2 at 3. Hunter helped hold down A.Q. while Rochelle performed the catheterization

---

[12] Hunter has not made any claims in this lawsuit on her daughter's behalf. Doc. 27 at ¶ 35; Doc. 42 at ¶ 35.

[13] Avera Defendants contend that Rochelle visited with Hunter about possible alternatives to catheterization, although Hunter disputes this conversation took place. Doc. 31 at ¶ 39; Doc. 39 at ¶ 39. Rochelle testified that since A.Q. was not yet potty-trained, Rochelle informed Hunter that A.Q. could (1) wait at the clinic and try again; (2) go home and come back later; (3) have a bag put around his privates and wait at the clinic; or (4) be catheterized. Doc. 31 at ¶ 44; Doc. 33-5 at 2. She also testified that Hunter chose to have the catheterization done. Doc. 31 at ¶ 45; Doc. 33-5 at 2. Hunter testified that Rochelle did not discuss any other option besides catheterization of A.Q. with her. Doc. 39 at ¶ 39; Doc. 40-1 at 9.

procedure. Doc. 27 at ¶¶ 38–39; Doc. 42 at ¶¶ 38–39; Doc. 31 at ¶ 55; Doc. 39 at ¶ 55. The procedure took a few minutes.[14] Doc. 31 at ¶ 57; Doc. 39 at ¶ 57. Upon completion of both children's drug screenings, Hunter stopped by the DSS office to inform Opbroek that the children's drug screens had been completed and to complete paperwork related to setting up a present danger plan involving Hunter's mother. Doc. 31 at ¶ 58; Doc. 39 at ¶ 58.

DSS has no official policy requiring catheterization to obtain a urine sample from a child. Doc. 27 at ¶ 52; Doc. 42 at ¶ 52. Opbroek did not know a catheter had been used to obtain a urine sample from A.Q. until Hunter told him after the catheterization had already occurred. Doc. 27 at ¶ 49; Doc. 42 at ¶ 49; Doc. 31 at ¶ 60; Doc. 39 at ¶ 60. Opbroek testified that the situation involving Hunter and her children was the only case Opbroek had ever been involved with where Avera Clinic conducted and processed the drug screening of children. Doc. 31 at ¶ 62; Doc. 39 at ¶ 62. DSS considers how urine samples are obtained to be a decision best determined by the medical provider. Doc. 27 at ¶ 52; Doc. 42 at ¶ 52. CPS is not aware of any other child being catheterized as a result of a drug screening or health assessment requested by CPS. Doc. 27 at ¶ 51; Doc. 42 at ¶ 51.

Rochelle testified that the catheterization was a medical procedure. Doc. 27 at ¶ 40; Doc. 42 at ¶ 40. Rochelle had catheterized many children before the procedure on A.Q. Doc. 27 at ¶ 39; Doc. 42 at ¶ 39; Doc. 31 at ¶ 49; Doc. 39 at ¶ 49. A.Q.'s urine was subject to a drug screen for an array of intoxicating substances. Doc. 27 at ¶ 45; Doc. 42 at ¶ 45. Rochelle was not aware of a way to limit the drug screen to one substance such as methamphetamine. Doc. 27 at ¶ 45; Doc. 42 at ¶ 45.

---

[14] A.Q. developed a urinary tract infection after the catheterization and received medical attention during later visits. Doc. 27 at ¶ 50; Doc. 42 at ¶ 50. The infection resolved after a second course of antibiotic medication. Doc. 27 at ¶ 50; Doc. 42 at ¶ 50.

Rochelle understood Hunter to be the person who could make medical decisions for A.Q. Doc. 27 at ¶ 41; Doc. 42 at ¶ 41. Opbroek was not consulted about how to collect urine samples from Hunter's children at Avera Clinic and did not direct anyone to have A.Q. catheterized. Doc. 27 at ¶ 44; Doc. 42 at ¶ 44. Rochelle testified that she made the decision to obtain the urine sample by catheterization and did so because Hunter wanted to use that method of obtaining the sample.[15] Doc. 27 at ¶ 41; Doc. 42 at ¶ 41. However, Hunter testified that she was given no other option to avoid losing her children than to get them drug tested at Avera Clinic and that once A.Q. could not produce voluntarily a urine sample, catheterization was presented as the lone option. Doc. 42 at ¶ 25; Doc. 43-3 at 2; Doc. 31 at ¶ 24; Doc. 39 at ¶ 24.

On February 27, 2017, Cass learned that the results from the screening were in and called Opbroek (and not Hunter) to inform CPS that the drug screens for both children were negative concerning any intoxicating substances. Doc. 27 at ¶ 46; Doc. 42 at ¶ 46; Doc. 31 at ¶ 59; Doc. 39 at ¶ 59; Doc. 33-6 at 7. On March 1, 2017, Cass faxed to Opbroek (and not Hunter) a copy of the medical toxicology results. Doc. 39 at ¶ 59; Doc. 33-6 at 8. Avera did not use the DSS methamphetamine medical charting form Opbroek dropped off and reported the results to CPS on Avera's own form. Doc. 27 at ¶ 46; Doc. 42 at ¶ 46; Doc. 31 at ¶ 33; Doc. 39 at ¶ 33. Hunter agreed to release her children's medical records to CPS. Doc. 27 at ¶ 27; Doc. 42 at ¶ 27. Hunter signed the medical release form authorizing DSS to access A.Q.'s medical records on April 6, 2017. Doc. 42 at ¶ CC; Doc. 43-11. Opbroek used the results as part of his initial family

---

[15] Rochelle testified that Hunter could have stopped the catheterization if she had observed anything that made her think using a catheter on A.Q. would be unsafe. Doc. 27 at ¶ 42; Doc. 42 at ¶ 42. Rochelle testified that Opbroek had not asked her to keep Hunter at the clinic until A.Q. provided a urine sample, and that she had no authority to keep Hunter from leaving the clinic without providing a urine sample. Doc. 27 at ¶ 43; Doc. 42 at ¶ 43.

assessment. Doc. 27 at ¶ 47; Doc. 42 at ¶ 47. Opbroek did not provide the drug screen results to anyone else. Doc. 27 at ¶ 47; Doc. 42 at ¶ 47. Hunter stated that she did not learn the results of the drug screening until September of 2017. Doc. 28-2 at 27.

Plaintiff's complaint contains four separate counts alleging violations of the Fourth Amendment, Fifth Amendment, and Due Process Clause of the Fourteenth Amendment. Doc. 13 at ¶ 1. Hunter seeks an order permanently enjoining the Defendants from catheterizing children for any non-medical purpose, compensatory and general damages, as well as attorney fees and costs. Doc. 12 at ¶¶ 56–58. DSS Defendants and Avera Defendants have moved for summary judgment on all claims. Docs. 25, 29.

## III. Analysis

### A. Avera Defendants as State Actors

Avera Defendants initially argue for summary judgment by asserting that they are not state actors and thus not subject to a § 1983 claim because the catheterization of A.Q. was for a medical purpose. Doc. 29 at 1. "Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" Blessing v. Freestone, 520 U.S. 329, 340 (1997) (citation omitted). "Private actors may incur section 1983 liability only if they are willing participants in a joint action with public servants acting under color of state law." Johnson v. Outboard Marine Corp., 172 F.3d 531, 536 (8th Cir. 1999) see Dennis v. Sparks, 449 U.S. 24, 27 (1980) (stating that a private actor is considered a state actor if the private actor is a "willful participant in joint action with the State or its agents"). A person may fairly be said to be a state actor if they "'acted together with or . . . obtained significant aid from state officials' in furtherance of the challenged action." Wickersham v. City of Columbia, 481 F.3d 591, 597 (8th Cir. 2007) (quoting Lugar v. Edmondson Oil Co., 457 U.S.

922, 937 (1982)). To establish liability under § 1983, a plaintiff "must establish, at the very least, an agreement or meeting of the minds between the private and state actors, and a corresponding violation of the plaintiffs' rights under the Constitution or laws of the United States." Johnson, 172 F.3d at 536; see West v. Atkins, 487 U.S. 42, 49 (1988). State action exists "only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." Pariser v. Christian Health Care Sys., Inc., 816 F.2d 1248, 1252 (8th Cir. 1987) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982)). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Parker v. Boyer, 93 F.3d 445, 447–48 (8th Cir. 1996) (quoting West, 487 U.S. at 49). Whether a defendant is a state actor is often a mixed question of law and fact. See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1276 (11th Cir. 2003) (citing Layne v. Sampley, 627 F.2d 12, 13 (6th Cir. 1980) ("Although in certain cases, it is possible to determine the question whether a person acted under color of state law as a matter of law, there may remain in some instances 'unanswered questions of fact regarding the proper characterization of the actions' for the jury to decide.")).

Hunter can show state action when a medical provider acts as an "investigative arm of the State." Thomas v. Nationwide Children's Hosp., 882 F.3d 608, 616 (6th Cir. 2018). This potential liability for acting as "an investigative arm of the state" must be based on the medical provider's own acts or failure to act and not based merely on respondeat superior. See Smith v. Insley's Inc., 499 F.3d 875, 880 (8th Cir. 2007) ("A corporation acting under color of state law will be held liable under section 1983 for unconstitutional policies, but will not be liable on a respondeat superior theory."). "A private corporation cannot be held liable under § 1983 for its employees'

13

deprivation of another's rights." Id. However, a private corporation may be liable under § 1983 if the injury alleged is the result of the corporation's policy or practice or if the corporation knew of its employees' misconduct and failed to take steps to end the misconduct. Id.

For example, in Kia P. v. McIntyre, 235 F.3d 749 (2d Cir. 2000), the Second Circuit held that a hospital, owned and administered by a private corporation, was a state actor when it was acting as a "reporting and enforcement machinery for . . . a government agency charged with detection and prevention of child abuse and neglect." Id. at 756. In Kia P., on March 27, 1993, Kia went into labor and disclosed to the hospital that she had used crack cocaine in the past, was HIV-positive, and had a history of tuberculosis and syphilis. Id. at 752. When Kia's daughter was born later that day, the hospital was concerned about the absence of adequate prenatal care and tested the newborn's urine for drugs, which preliminarily tested positive for methadone. Id. The hospital, as required by statute, reported to the New York City Child Welfare Administration (CWA) that the newborn tested positive for methadone. Id. at 756. Kia was discharged from the hospital on March 29, 1993, but the hospital refused to discharge Kia's newborn daughter for two reasons. Id. at 752. First, the hospital believed the newborn had drugs in her system because of the positive test result and wanted to monitor her health for withdrawal. Id. Second, the hospital held the newborn in accordance with its own policy and CWA's "policies requiring that any child under investigation by CWA not be released from the [h]ospital without CWA permission." Id. at 752–53. After the initial test came back positive, the hospital sent the newborn's urine sample to an outside laboratory for confirmatory testing. Id. at 753. On April 6 or 7, the hospital learned that the confirmation test found no drugs in the newborn's urine. Id. Subsequently, the hospital cleared the baby for discharge. Id. The Court held that all of these actions until April 6 or 7 were "taken by the [h]ospital in its capacity as a private provider of medical care and thus do not subject

14

the [h]ospital to liability under § 1983." Id. at 756. However, the hospital did not release the newborn until April 8 solely because CWA did not give the hospital permission to release the baby until April 8 because CWA had concerns about child abuse and child welfare. Id. at 757. The Second Circuit reasoned that holding the newborn after she was medically cleared on April 6 or 7 until April 8 subjected the hospital to liability under § 1983 as state actors during that time because the baby was there "solely pending action by the CWA." Id.

Here, when viewing the evidence in the light most favorable to Hunter, Avera Clinic is not a state actor. Plaintiff argues that Avera's CAC policies and contracts apply to the Avera Clinic and constitute unconstitutional practice and procedure. This Court need not decided whether CAC's policies and practices are unconstitutional. Any policies and interagency contracts CAC has do not extend to Avera Clinic, nor is it Avera Clinic's practice to apply these policies. Unlike the hospital in Kia P. whose policy directed that children not be released under certain circumstances without the permission of CWA, Avera Clinic had no such policies related to catheterization of children and DSS. Additionally, there is no evidence Avera Clinic knew of any alleged employee misconduct and failed to correct the misconduct concerning catheterization of children for DSS. No evidence has been presented that Avera Clinic had a policy or practice to collect evidence for a state investigation by forcefully catheterizing children without parental consent and without judicial approval. Summary judgment is granted for Avera Clinic on all claims because Avera Clinic is not a state actor and cannot be held to be a state actor based merely on respondeat superior principles.

Hunter also alleges that Doe Defendants 1–4 who participated in the catheterization of A.Q. and were present at the hospital are state actors. Doc. 12 at ¶ 24. No evidence has been presented that Doe Defendants 1–4 knew anything about the DSS investigation or knew the purpose of the

15

urinalysis. There was no "meeting of the minds" between Doe Defendants 1–4 and DSS to collect evidence for the state, so Doe Defendants 1–4 are not state actors and any claims against Doe Defendants 1–4 are dismissed. See Doe v. Tsai, No. CIV.08-1198 (DWF/AJB), 2010 WL 2605970, at *13 (D. Minn. June 22, 2010) (holding that no reasonable juror could conclude that three nurses violated Plaintiffs' constitutional rights when they had limited involvement in the physical examinations of the children), aff'd sub nom. Doe ex rel. Thomas v. Tsai, 648 F.3d 584 (8th Cir. 2011).

However, the same is not true for defendants Rochelle and Cass. Medical defendants can become "state actors when the rationale behind their [treatment of a child] ceased to be medical necessity and became solely the investigation of child abuse." Estiverne v. Esernio-Jenssen, 581 F. Supp. 2d 335, 345–46 (E.D.N.Y. 2008). Rochelle was not acting as a medical provider for Hunter or A.Q. when retrieving a urine sample from A.Q. Hunter testified that she tried to schedule the urinalysis but was not able to without DSS's help. If the urinalysis was for a medical purpose, Hunter should have been able to schedule the appointment for her children to have the testing preformed. Indeed, Opbroek called Avera Clinic to successfully schedule the appointment, advised Hunter of the appointment being made, and dropped off the DSS methamphetamine medical charting form at the clinic. Although this methamphetamine medical charting form was never used by Rochelle, Rochelle discussed the purpose of the appointment with Opbroek and carried through with Opbroek's request to obtain urine samples, albeit using a catheter on A.Q. without Opbroek's knowledge or direction.

Rochelle argues that the catheterization was for a medical purpose and testified that the catheterization was a medical procedure. However, Rochelle evidently did not perform the test because A.Q. exhibited medical signs of drug ingestion. Rochelle did not check vitals or conduct

16

any other evaluation of A.Q. See Doc. 40-4 at 9. Rochelle followed the directive from Opbroek and tested A.Q.'s urine. Simply because catheterization is a medical procedure does not mean it was done for medical reasons. See Tenenbaum v. Williams, 193 F.3d 581, 599 (2d Cir. 1999) ("During the examination of [the child] 'to rule out [the possibility of] sexual abuse,' injuries might have been found, and if so we would surely expect them to have been treated. But that possibility did not turn an investigative examination into one that is 'medically indicated' and designed for treatment."). When viewing the facts in the light most favorable to Plaintiff, Rochelle is a state actor because her actions were taken to collect evidence for the state.

Cass is also a state actor. Rochelle communicated with Cass over the telephone that the test was being performed because Opbroek had told Hunter to have her children drug screened. Cass subsequently ordered the drug screen. On February 27, 2017, Cass became aware that the results from the screening were in and, instead of calling Hunter, she called Opbroek to inform him that the results were negative. On March 1, 2017, Cass faxed to Opbroek a copy of the medical toxicology results. Hunter did not sign a written authorization to allow DSS to have access to A.Q.'s medical records until April 2017, so Cass released the results to DSS before written authorization was obtained. Hunter was not made aware of the results until months later. Opbroek used the results as part of his investigation for DSS, a state agency. Plaintiff has put forth sufficient facts to show there was a meeting of the minds among Cass, Rochelle, and Opbroek to collect and test A.Q.'s urine sample as evidence for DSS's investigation.

### B. Personal Capacity Claims

#### 1. Individual Capacity and Qualified Immunity

Under § 1983, state officials may be sued in their individual capacities, their official capacities, or both. Johnson, 172 F.3d at 535. Here, Hunter is suing different defendants in

different capacities under each count. As explained more fully below, individual and official capacity suits differ in both their pleading requirements and the defenses available to the official. See Hafer v. Melo, 502 U.S. 21, 25 (1991). Because of these differences, this Court will address Hunter's individual capacity and official capacity claims separately.

Plaintiff seeks compensatory and general damages against each of the individual defendants sued in his or her personal capacity.[16] Doc. 12 at ¶ 57. Qualified immunity is one of the defenses available to state officials sued in their individual capacities under § 1983. "Qualified immunity shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. If the court finds that one of the two elements is not met, the court need not decide the other element, and a court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009). "Government officials are entitled to qualified immunity '[u]nless both of these questions are answered affirmatively.'" Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (alterations in original) (quoting Nord v. Walsh Cty., 757 F.3d 734, 738 (8th Cir. 2014)).

---

[16] Plaintiff also alleges what appears to be an individual capacity claim against Avera St. Mary's Hospital. However, Rochelle and Cass being state actors for the purposes of this case does not render St. Mary's Hospital liable based on respondeat superior principles. See Insley's Inc., 499 F.3d at 880.

A § 1983 claim cannot be based upon vicarious liability. <u>Kulow v. Nix</u>, 28 F.3d 855, 858 (8th Cir. 1994). That is, "a general responsibility for supervising the operations of a [state agency] is insufficient to establish the personal involvement required to support liability" for an alleged constitutional violation. <u>Camberos v. Branstad</u>, 73 F.3d 174, 176 (8th Cir. 1995). Thus, this Court must consider whether "each Government-official defendant, through the official's own individual actions, has violated the Constitution." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009).

Wieseler is the Division Director for CPS. Doc. 28-1 at 1. Valenti is the Secretary of DSS. Doc. 12 at ¶ 19. Plaintiffs' complaint is devoid of any allegations against Wieseler or Valenti in their personal capacities. <u>See</u> Doc. 12. Additionally, Plaintiffs' Brief in Opposition to DSS Defendants' Motion for Summary Judgment does not mention either of these two defendants. <u>See</u> Doc. 41. Because Plaintiff does not allege that Wieseler or Valenti deprived her or A.Q. "of any rights, privileges, or immunities secured by the Constitution and laws," <u>Blessing</u>, 520 U.S. at 340, and because Plaintiff does not argue liability based on any theory, such as "supervisory authority," summary judgment is granted for Wieseler and Valenti on all personal capacity claims, <u>see</u> <u>Ripson v. Alles</u>, 21 F.3d 805, 809 (8th Cir. 1994) (discussing ways a supervisor may be held liable under § 1983). The remaining defendants that may be sued under § 1983 in their individual capacities are Opbroek, Cass, and Rochelle.

### 2. Counts in the Complaint

#### a. Count I: Fourth Amendment

##### i) Step One: Constitutional Violation

Hunter claims that "[t]he search of A.Q. violates the Fourth Amendment because it was unreasonable and because it was not authorized by a judge." Doc. 12 at ¶ 13. Hunter is asserting this claim on behalf of A.Q. Doc. 41 at 5. The Fourth Amendment of the United States

19

Constitution prohibits unreasonable searches and seizures. United States v. Place, 462 U.S. 696, 701 (1983). "[S]tate-compelled collection and testing of urine . . . constitutes a 'search' subject to the demands of the Fourth Amendment." Levine v. Roebuck, 550 F.3d 684, 687 (8th Cir. 2008) (quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995)). "Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned." Schmerber v. California, 384 U.S. 757, 770 (1966). In Andrews v. Hickman County, 700 F.3d 845 (6th Cir. 2012), the Sixth Circuit held that "a social worker, like other state officers, is governed by the Fourth Amendment's warrant requirement." Id. at 859–60. The Fourth Amendment is implicated when a child is subjected to a medical examination conducted at a private hospital undertaken at the initiative of a state official that serves primarily an investigative function. Tenenbaum, 193 F.3d at 606; see id. at 602 (affirming the district court's holding that a physical examination of a five-year-old girl where "[t]he gynecological examination included the insertion of a cotton swab in [the girl's] vagina and anus" without consent or a court order violated the girl's constitutional rights).

However, there are exceptions to the warrant requirement, two of which are exigent circumstances and consent. United States v. Uscanga-Ramirez, 475 F.3d 1024, 1027–28 (8th Cir. 2007). "Consent to search is a valid exception to the warrant requirement if the consent is knowingly and voluntarily given." Id. at 1027 (citation omitted). "[V]oluntariness of consent to a search must be 'determined from the totality of all the circumstances.'" Birchfield v. North Dakota, 136 S. Ct. 2160, 2186 (2016) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). Hunter testified that Opbroek stated that her children would be taken away if she did not get a urinalysis performed on the children. Based on that statement, there is at least a genuine issue of material fact on whether Hunter's consent was obtained through coercion. See Goings v.

Chickasaw Cty., 523 F. Supp. 2d 892, 912 (N.D. Iowa 2007) (stating that ordinarily, testimony that a person's children will be taken away if they do not consent to a search will be sufficient to survive summary judgment); Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (holding that a confession was coerced and not voluntary, where the suspect made the confession "only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate'"); United States v. Tingle, 658 F.2d 1332, 1335–36 (9th Cir. 1981) (reaching the same conclusion in case involving less explicit threats, because "[t]he relationship between parent and child embodies a primordial and fundamental value of our society").

Opbroek argues that he cannot be liable for the catheterization because he did not know a catheter would be used for the urinalysis. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Iqbal, 556 U.S. at 676. Opbroek's actions when viewed in the light most favorable to Plaintiff include threatening Hunter that her children would be taken away if she did not have her children drug screened, scheduling the children's urinalysis appointments, and obtaining results of the urinalysis thereafter. Opbroek neither attended the appointment with Hunter and her children, nor knew how the urine would be collected, nor directed the use of a catheter on A.Q.

In Levine v. Roebuck, the Eighth Circuit held that a correctional officer could not be held liable for the catheterization of an inmate because liability under § 1983 is personal. Levine, 550 F.3d at 689. In Levine, a correctional officer threatened an inmate that he would be subject to discipline if he did not produce a urine sample, which was consistent with the prison's drug testing policy. Id. at 688. The inmate could not produce a sample, so the officer ordered the inmate to be

taken to be catheterized, which then occurred. Id. at 689. The inmate argued that the catheterization violated his Fourth Amendment rights because his consent was only given because he was threatened with prison discipline otherwise. Id. However, the Eighth Circuit held that the correctional officer was not personally responsible for any involuntary catheterization, so he did not violate the inmate's Fourth Amendment rights. Id. Similar to Levine, "even if [Opbroek] ordered [Hunter] to go to the [hospital], [he] had no contact with the medical professionals after [Hunter] arrived and no authority to direct those professionals to undertake the catheterization procedure if they thought it medically inappropriate or if [Hunter] refused to consent." Id. While Levine is a prison case and "a prison inmate has a far lower expectation of privacy than do most other individuals in our society," id. at 687, the same vicarious liability principles apply in this case. Opbroek is not vicariously liable for the actions of Rochelle or Cass. Because Opbroek was not personally responsible for the catheterization that occurred, Opbroek did not violate A.Q.'s Fourth Amendment rights. See id. at 689. Thus, summary judgment will enter for Opbroek in his personal capacity on A.Q.'s Fourth Amendment rights claim.

As state actors, Cass and Rochelle are acting similarly to state hospital staff with respect to A.Q. A state hospital's staff are government actors, subject to the Fourth Amendment. Ferguson v. City of Charleston, 532 U.S. 67, 76 (2001). When state hospitals undertake to obtain evidence from their patients for the specific purpose of incriminating those patients, they have a special obligation to make sure that the patients are fully informed about their constitutional rights, as standards of knowing waiver require. Id. at 85. Cass had no interaction with Hunter or A.Q. and ordered urine samples to be obtained and tested, not directing that catheterization of A.Q. be the method. Thus, Cass's individual actions are far less than the correctional officer in Levine whom the Eighth Circuit found not to be liable as a matter of law. Levine, 550 F.3d at 688–89. By

contrast, Rochelle is the one who chose to and did catheterize A.Q. to obtain his urine sample. Whether or not Rochelle knew Hunter's consent was obtained by coercion from Opbroek, she knew that the urinalysis was to collect evidence for DSS. Neither Rochelle nor anyone else informed Hunter about any constitutional rights or obtained written consent for the catheterization, in violation of the Fourth Amendment.

Notwithstanding the compulsion from the threat of her children being taken, a jury could conclude from Hunter's actions that she consented to urine samples from her children, and indeed Hunter makes no claim on behalf of her daughter who voluntarily urinated into a hat-shaped container to give a sample. Even so, a reasonable jury could find that Hunter did not consent to a urinalysis by catheterization of A.Q. Plaintiffs argue that the manner in which A.Q.'s urine was obtained violated A.Q.'s Fourth Amendment rights against unreasonable searches and seizures.[17] Doc. 41 at 40–41. "If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the [consent to the search], the subsequent seizure is unconstitutional without more." Horton v. California, 496 U.S. 128, 140 (1990). When viewing the facts in the light most favorable to Plaintiff, there is at least a question of fact whether Rochelle violated A.Q.'s Fourth Amendment rights on the basis of an unreasonable seizure. Doc. 41 at 42. After all, "[c]atheterization is an invasive medical procedure. It involves insertion of a tube through the suspect's urethra and into the bladder to obtain a urine sample. Such a highly intrusive act raises the question if and when it is a reasonable method of urine collection." South Dakota v. Hi Ta

---

[17] Substantive due process claims are unavailable when the claims are covered by the Fourth Amendment. Cty. of Sacramento v. Lewis, 523 U.S. 833, 843 (1998); Garcia-Torres v. Holder, 660 F.3d 333, 337 (8th Cir. 2011). Plaintiff claims that the way the catheterization was performed shocks the conscience and violates the Substantive Due Process clause of the Fourteenth Amendment. Doc. 41 at 40–41. However, the Fourth Amendment covers unreasonable searches and seizures, so this claim is analyzed under the Fourth Amendment.

Lar, 2018 SD 18, ¶ 24, 908 N.W.2d 181, 188 (Kern, J., concurring). "Moreover, the forceful use of a catheter is a 'gross personal indignity' far exceeding that involved in a simple blood test." Ellis v. City of San Diego, 176 F.3d 1183, 1192 (9th Cir. 1999) (quoting Yanez v. Romero, 619 F.2d 851 (10th Cir. 1980)).

The catheterization of A.Q. was not based on exigent circumstances. There is no indication that an immediate urinalysis was necessary to prevent the presence of drugs from dissipating from A.Q.'s urine. Opbroek did not believe that the potential danger from exposure to methamphetamine was sufficient to have the children screened on the night of February 22, 2017. A day and a half had passed between when Opbroek initially saw the need for a urinalysis and when A.Q. was tested. When viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Rochelle violated A.Q.'s Fourth Amendment rights by using an unreasonable method to collect a urine sample.

Despite being a state actor under these circumstances, Cass cannot be held vicariously liable for Rochelle's involuntary catheterization of A.Q. While Cass gave an order to get a urine sample and communicated the results to Opbroek, Cass was not present for the catheterization and did not specifically order catheterization of A.Q. Cass has not violated A.Q.'s constitutional rights based on her own actions. See Levine, 550 F.3d at 689 (holding that a correctional officer did not violate the defendant's Fourth Amendment rights because he was not personally responsible for the catheterization). For the same reasons Opbroek is not vicariously liable for the actions of Rochelle, Cass is not vicariously liable for Rochelle's actions. Accordingly, Cass is entitled to summary judgment on A.Q.'s Fourth Amendment claim.

### ii) Step Two: Clearly Established Right

Even if A.Q. was deprived of a constitutional right, Defendants can claim the protection of qualified immunity if that right was not "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Stanton v. Sims, 571 U.S. 3, 6 (2013) (per curiam) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)). Qualified immunity does not require there be a case directly on point before concluding that the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." Id. at 6 (citation omitted). "In order to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right[,]" and "[r]eciting an abstract right at a high level of generality will not suffice." Ehlers v. City of Rapid City, 846 F.3d 1002, 1008 (8th Cir. 2017) (citations, alteration, and internal quotations omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741 (2002). "To overcome qualified immunity, a plaintiff typically must identify either 'cases of controlling authority in their jurisdiction at the time of the incident' or 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" Jacobson v. McCormick, 763 F.3d 914, 918 (8th Cir. 2014) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007) (citation omitted).

The DSS Defendants argue that requesting a drug screening of a minor child by medical personal is not a violation of a clearly established right. Doc. 46 at 11–12. However, viewing the facts in the light most favorable to A.Q., which this Court is required to do at the summary

judgment stage, the question is whether threatening a person that her children will be taken away unless the children submit to a drug screening to collect evidence for the DSS is a violation of a clearly established right. Ultimately, this Court need not determine this answer because no DSS Defendants violated A.Q.'s Fourth Amendment rights. Only as to Rochelle is there a genuine issue of material fact over any Avera Defendant having violated A.Q.'s Fourth Amendment rights. Rochelle has not raised a qualified immunity defense and does not appear to have such a defense available to her. See Richardson v. McKnight, 521 U.S. 399, 401 (1997) (private company prison guards not entitled to qualified immunity defense in § 1983 case).[18]

### b. Count II: Fifth and Fourteenth Amendment Due Process

Plaintiff claims in her complaint that Defendants' coercion of Hunter's consent to cooperate or lose custody of her children violated the Due Process Clause of the Fifth Amendment[19] and Fourteenth Amendment. Doc. 12 at 10. This Court interprets Count II in Plaintiff's Amended Complaint as a procedural due process claim. "To establish a violation of procedural due process, [Hunter] must [show] 1) [the defendants] deprived [Hunter] of life, liberty, or property; and 2) [the defendants] deprived [Hunter] of that interest without sufficient process." Clark v. Kansas City Mo. Sch. Dist., 375 F.3d 698, 701 (8th Cir. 2004) (citation and internal quotation marks omitted). During oral argument on the motions for summary judgment,

---

[18] The Avera Defendants did not plead a defense of qualified immunity either. Rule 8(c) of the Federal Rules of Civil Procedure requires a party to plead affirmative defenses in its answer. Fed. R. Civ. P. 8(c); see also Swanson v. Van Otterloo, 177 F.R.D. 645, 647 (N.D. Iowa 1998) (stating that qualified immunity is an affirmative defense to be plead in a responsive pleadings). The general rule is that failure to plead an affirmative defense results in waiver of that defense. Sherman v. Winco Fireworks, Inc., 532 F.3d 709, 714–15 (8th Cir. 2008). Because the Avera Defendant, including Rochelle, did not plead a qualified immunity defense, they have waived such a defense.

[19] Plaintiff concedes that there is no Fifth Amendment Due Process claim in this case. Doc. 41 at 37–38.

Plaintiff's counsel conceded that a procedural due process claim existed only if, as some Defendants had suggested, the children were removed from Hunter's custody. Opbroek testified that the children "were always in [Hunter]'s custody; we never requested to remove custody from her . . . . [W]e never requested custody or stated the children were not in her custody." Doc. 43-5 at 5. Plaintiff maintains that DSS Defendants never removed the children from her custody. Even when viewing the facts in the light most favorable to Plaintiff, there is no procedural due process claim because the children were never removed from Hunter's custody, so Defendants are entitled to summary judgment on Count II of the Amended Complaint.

### c. Count III: Substantive Due Process

Count III of the Amended Complaint alleges that Defendants violated Plaintiff's substantive due process right to familial relationships. Doc. 41 at 36.[20] The substantive due process claim is brought on behalf of both Hunter and A.Q. Doc. 41 at 39. In § 1983 actions involving interference with the right to familial integrity, "it is nearly impossible to separate the constitutional violation analysis from the clearly established right analysis." K.D. v. Cty. of Crow Wing, 434 F.3d 1051, 1055 (8th Cir. 2006) (quoting Manzano v. S.D. Dep't of Soc. Servs., 60 F.3d 505, 510 (8th Cir.1995)).

"For all its consequence, 'due process' has never been, and perhaps never can be, precisely defined." Lassiter v. Dep't of Social Servs., 452 U.S. 18, 24 (1981). However, "[s]ince the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary [government] action." Cty of Sacramento v. Lewis, 523 U.S. 833, 845

---

[20] Plaintiff also alleges that the Defendants' conduct of securing a urine sample from A.Q. by catheterizing him shocks the conscience or interferes with rights implicit in the concept of ordered liberty in violation of A.Q.'s rights and Hunter's rights guaranteed by the Due Process Clause of the Fifth and Fourteenth Amendments of the Constitution. Doc. 12 at 11. For the reasons explained in footnote 17, this Court has analyzed that claim under the Fourth Amendment.

(1998); see also Tenenbaum, 193 F.3d at 600 ("Substantive due-process rights guard against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" (quoting Cty. of Sacramento, 523 U.S. at 846)).

Parents have a liberty interest in the "care, custody, and management of their children." Swipies v. Kofka, 419 F.3d 709, 713–14 (8th Cir. 2005) (quoting Manzano, 60 F.3d at 509–10); see Santosky v. Kramer, 455 U.S. 745, 753 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . ."). The right has been described as "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." Troxel v. Granville, 530 U.S. 57, 69–70, 72 (2000). However, "this interest is "limited by the state's compelling interest in protecting a child." Stanley v. Finnegan, 899 F.3d 623, 627 (8th Cir. 2018) (citation and internal quotation marks omitted). In cases where the rights of the parent are balanced against the state's interest in protecting the child, the qualified immunity defense is difficult to overcome. K.D., 434 F.3d at 1055.

"Generally, mere verbal threats made by a state-actor do not constitute a § 1983 claim." King v. Olmsted Cty., 117 F.3d 1065, 1067 (8th Cir. 1997). `In King v. Olmsted County, the Eighth Circuit held that "a threat constitutes an actionable constitutional violation only when the threat is so brutal or wantonly cruel as to shock the conscience . . . or if the threat exerts coercive pressure on the plaintiff and the plaintiff suffers the deprivation of a constitutional right." King, 117 F.3d at 1067. In King, social services workers allegedly "interfered with [Mr. and Mrs. King's] right to familial relations by coercing and manipulating them with threats that Social Services would take [two of their children] unless the Kings 'cooperat[ed] with what the government wanted to do to [another one of their children].'" Id. The Eighth Circuit reasoned that the threats did not

constitute an actionable constitution violation because the threats were not so brutal or wantonly cruel to shock the conscience and the threats did not exert coercive pressure on the Kings because the Kings did not act on these statements. Id. at 1067–68. In coming to this conclusion, the Eighth Circuit stated that the social workers did not exhibit any signs that they would act on these threats, the Kings were represented by counsel, the Kings had ample time to challenge the threats, and the Kings did not show that they were coerced by the threats. Id.

Here, similar to King, the threat by Opbroek to Hunter that she would have her children taken away unless they were drug tested, "although seemingly inappropriate, do[es] not rise to the level of a constitutional violation." See id. at 1067. After all, Hunter admitted using methamphetamine with the children nearby, appeared to be under the influence while in the presence of the children, and had drug paraphernalia where Obproek thought the children might be able to reach it. Doc. 27 at ¶¶ 15–16, 18–19; Doc. 42 at ¶¶ 15–16, 18–19. However, unlike in King, Hunter did act on Opbroek's threat and coercive pressure by taking her children to Avera Clinic to have them drug screened.

Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the "'compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.'" Manzano, 60 F.3d at 510 (quoting Myers v. Morris, 810 F.2d 1437, 1462 (8th Cir. 1987), overruled on other grounds by Burns v. Reed, 500 U.S. 478 (1991)). "[W]hen a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse." Manzano, 60 F.3d at 511.

Opbroek had a reasonable suspicion of child abuse. Hunter admitted that she had done drugs while her children were present in the home, she provide a urine sample that field tested positive for methamphetamine and marijuana, Opbroek thought Hunter was still under the influence of drugs when he visited the home, Opbroek observed drug paraphernalia where her children might get to it, and law enforcement informed him that there were drugs in the house. Doc. 27 at ¶¶ 15–16, 18–19; Doc. 42 at ¶¶ 15–16, 18–19. Under Manzano and the facts not subject to genuine dispute, Opbroek is entitled to qualified immunity for the nature of his interference with Hunter's familial relationship. Opbroek's conduct under the circumstances does not constitute arbitrary government action. The Avera Defendants did not threaten to take away Hunter's children or have the apparent authority to do so. Notwithstanding that qualified immunity defenses do not apply to the Avera Defendants, all Defendants are entitled to summary judgment on this claim as well.

### d. Count IV: Civil Conspiracy

Plaintiff alleges in Count IV of the Amended Complaint that Defendants Valenti, Weiseler, Opbroek, Rochelle, Cass, and Doe Defendants 1–4 have violated rights guaranteed to Hunter and A.Q. by 42 U.S.C. § 1985 through a conspiracy to deprive A.Q. of his right to be free of unreasonable search and seizure and excessive force without due process. Doc. 12 at 11–12. A conspiracy claim under 42 U.S.C. § 1985 requires proof of some meeting of the minds among defendants resulting in an agreement, express or tacit, to achieve an unlawful end—in this case, allegedly depriving Hunter and A.Q. of constitutional rights to be free from unlawful and unreasonable searches and seizures. 42 U.S.C. § 1985; see also Barstad v. Murray Cty., 420 F.3d 880, 887 (8th Cir. 2005); Seale v. Madison Cty., 929 F. Supp. 2d 51, 71 (N.D.N.Y 2013). While there is evidence that Rochelle and Opbroek had a meeting of the minds that Rochelle would

collect evidence for DSS, the meeting of the minds did not include, or even involve discussion of, catheterizing A.Q. to obtain the urine sample and thus was not a meeting of minds to violate Plaintiff's constitutional rights. Summary judgment is granted for the Defendants on Plaintiff's conspiracy claim.

### C. Claims against Defendants in their Official Capacities

DSS Defendants argue that "Hunter's claims alleged against the Department of Social Services are barred by the Eleventh Amendment. Her claims against State employees acting in their official capacities are likewise barred by the Eleventh Amendment to the extent that she seeks money damages." Doc. 26 at 10. First, § 1983 only provides a cause of action against a "person" who, acting under the color of state law, deprives another of his or her federal constitutional or statutory rights. See Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989). The Supreme Court in Will held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" when sued for money damages. Id. Eleventh Amendment immunity also extends to state agencies. Hadley v. N. Ark. Cmty. Tech. Coll., 76 F.3d 1437, 1438 (8th Cir.1996). Section 1983 therefore does not allow Plaintiff to sue the DSS or DSS employees in their official capacity for damages. Will, 491 U.S. at 71; see also Arizonans for Official English v. Arizona, 520 U.S. 43, 69 n.24 (1997) ("State officers in their official capacities, like States themselves, are not amenable to suit for damages under § 1983.").

Second, absent consent by the state or congressional abrogation of immunity, "the Eleventh Amendment prohibits federal-court lawsuits seeking monetary damages from individual state officers in their official capacities because such lawsuits are essentially 'for the recovery of money from the state.'" Treleven v. Univ. of Minn., 73 F.3d 816, 818 (8th Cir. 1996) (footnote omitted) (quoting Ford Motor Co. v. Dep't of the Treasury, 323 U.S. 459, 464 (1945)). DSS has not

31

consented to official capacity suits under § 1983, § 1983 has not abrogated DSS Defendants' Eleventh Amendment immunity, and the DSS Defendants have raised Eleventh Amendment immunity as a defense in this case. Doc. 14 at ¶ 29; Doc. 26 at 9; see Ballegooyen v. Brownson, 4:14-CV-04186-KES, 2016 WL 5794719, at *3 (D.S.D. Sept. 30, 2016) (holding that SDCL § 21-32-16 did not waive the Eleventh Amendment immunity of two state agencies). Thus, the Eleventh Amendment bars Plaintiff's claims for damages against the DSS Defendants in their official capacities. Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989) ("The Eleventh Amendment presents a jurisdictional limit on federal courts in civil rights cases against states and their employees.").

However, Plaintiff clarified that "[n]o money damages are sought from DSS or the DSS Defendants in their official capacities." Doc. 41 at 16. Plaintiff's requested relief in her Amended Complaint includes an award for "compensatory and general damages, in an amount to be proven at trial, against Avera St. Mary's and against each of the individual defendants sued in his or her *personal capacity*." Doc. 12 at ¶ 57 (emphasis added). Because summary judgment as explained above should enter for the DSS Defendants for all alleged constitutional violations, Plaintiff has no remaining claim against the DSS Defendants for damages.

Plaintiff also seeks prospective declaratory and injunctive relief for the ongoing government use of catheterization of children for non-medical purposes against Defendants in their official capacities. Doc. 12 at ¶¶ 55–56; Doc. 41 at 15. Plaintiffs argue that "forcible catheterizations of young children could continue if the DSS Defendants are not enjoined from requesting urine tests without a warrant or removal." Doc. 41 at 44. Official capacity suits are "another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation omitted). "A suit for injunctive or declaratory relief avoids [Eleventh Amendment] immunity if the official has some connection to the enforcement of

the challenged laws." Calzone v. Hawley, 866 F.3d 866, 869 (8th Cir. 2017) (citing Ex parte Young, 209 U.S. 123, 157 (1908)). Suits against state employees in their official capacities that seek only prospective, injunctive relief are allowed by § 1983, Will, 491 U.S at 71 n.10 (explaining that state officials are "persons" under § 1983 when sued for injunctive relief in their official capacities), and are not barred by the Eleventh Amendment, Ex parte Young, 209 U.S. at 157–60 (holding that state officials may be sued in their official capacities for prospective injunctive relief without violating the Eleventh Amendment).

Plaintiff of course bears the burden of establishing that she has standing under Article III of the Constitution to request the particular injunctive relief sought. Park v. Forest Serv. of U.S., 205 F.3d 1034, 1036–37 (8th Cir. 2000). To demonstrate standing, Plaintiff must establish an injury in fact; a causal connection between the injury and the alleged conduct of the Defendants; and a likelihood that the remedy she seeks will redress the alleged injury. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102–03 (1998). When, as here, the plaintiff is seeking injunctive relief, "the 'injury in fact' element of standing requires a showing that the plaintiff faces a threat of ongoing or future harm." Park, 205 F.3d at 1037. Evidence that the plaintiff suffered an injury in the past does not alone establish that the plaintiff has standing to seek injunctive relief. See O'Shea v. Littelton, 414 U.S. 488, 495–96 (1974) (holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects"). A plaintiff's speculation that he or she may suffer injury in the future is likewise insufficient. City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (explaining that a "conjectural" or "hypothetical" threat of injury does not establish standing). Instead, as the Supreme Court made clear in Lyons, the plaintiff must show that "the injury or threat of injury" is "'real and immediate'" to have standing to seek injunctive relief. Id.

In Lyons, the plaintiff sought injunctive relief barring police officers from the City of Los Angeles from using chokeholds unless suspects were threatening the officers with the immediate use of deadly force. Id. at 98. The Supreme Court held that the plaintiff did not have standing to seek such relief because he had failed to demonstrate that there was a sufficient likelihood that the police would subject him to a chokehold in the future. Id. at 105–10. Although the plaintiff had been subjected to a chokehold in the past and alleged that the police officers routinely applied chokeholds when they were not threatened by deadly force, the Supreme Court concluded that these facts fell short of establishing that the plaintiff faced a real and immediate threat of future harm. Id. 105–06.

Like the plaintiff in Lyons, Plaintiff has failed to demonstrate that there is a sufficient likelihood that she or A.Q. will suffer harm from being forced to submit to catheterization in the future. Plaintiff has not offered sufficient evidence that the Defendants have an ongoing policy of forcing children to submit to forced catheterizations in violation of their constitutional rights or that other children have been treated in a similar manner. The undisputed facts show that Opbroek did not know a catheter would be used on A.Q. and that DSS policy left the determination of how urine would be collected to the medical provider. In short, Plaintiff lacks standing to seek injunctive relief due to the absence of a sufficient likelihood that Hunter or A.Q. faces a real and immediate future threat of being forced to submit to catheterization in a manner that could violate their constitutional rights. See id.; Knox v. McGinnis, 998 F.2d 1405, 1413–15 (7th Cir. 1993) (holding that prisoner's speculation that he could be returned to segregation did not give him standing to seek injunctive relief against prison's use of "black box" restraining device on all inmates in segregation).

**IV. Conclusion**

For the reasons explained above, it is hereby

ORDERED that DSS Defendants' motion for summary judgment, Doc. 25, is granted. It is further

ORDERED that Avera Defendants' motion for summary judgment, Doc. 29, is granted in part and denied in part, in that the § 1983 claims that Rochelle violated Plaintiff's Fourth Amendment rights by subjecting A.Q. to catheterization without Hunter's consent or by subjecting A.Q. to an unreasonable search survive Avera Defendants' motion for summary judgment. Avera Defendants' motion for summary judgment is otherwise granted.

DATED this 25th day of March, 2019.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE